**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| PATRICK KIRKSEY | § | |
| | § | **C.A. NO. G-05-057** |
| VS. | § | |
| | § | |
| | § | |
| P&O PORTS TEXAS, INC., | § | |
| TONGHAI MARITIME, | § | |
| COSCO BULK CARRIER CO., LTD. d/b/a | § | Pursuant to Rule 9(h) of |
| COSCO BULK, COSCO GROUP, and | § | the Federal Rules of Civil |
| COSCO AMERICA, INC. | § | Procedure – ADMIRALTY |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

TO THE HONORABLE COURT:

This cause came on for a non-jury trial July 13, 2006. Having carefully considered all pleadings, the trial record, all exhibits, the credibility of each witness and all post-trial submissions, on the basis of a preponderance of the evidence and applicable law, the Court hereby enters its Findings of Fact and Conclusions of Law.

**I. FINDINGS OF FACT**

**A. NATURE OF THE CASE**

1. This is a personal injury claim brought by longshoreman Patrick Kirksey ("Kirksey") pursuant to 33 U.S.C. §905(b) against Defendant Tonghai Maritime ("Tonghai"), the owner of M/V TONG HAI (the "Vessel"), and Defendants Cosco Bulk Carrier Co., Ltd. ("Cosco"), the Vessel's operator, and Pan Ocean Shipping Co., Ltd. ("Pan Ocean"), the Vessel's charterer. Plaintiff filed this case alleging that as a result of Defendants' violation of the "turn over duty," he sustained injuries to his right upper extremity, right lower extremity, including amputation of the right leg above the knee, and right shoulder, along with internal injuries, when an 8,000

pound coil fell on him on the morning of December 14, 2004. Defendants denied that they were liable for these serious and permanent injuries, necessitating trial.

## B. PARTIES AND JURISDICTION

1. Plaintiff Kirskey resides in Houston, Texas, within the Southern District of Texas. Kirksey worked as a longshoreman through ILA Local 24, and on December 14, 2004 he was working on Defendants' Vessel unloading Pan Ocean's cargo. The Vessel, which regularly calls at the Port of Houston, was docked at City Dock 26, Port of Houston, on this occasion.  All Defendants submitted to this Court's exercise of personal jurisdiction.

2. The Court finds this case is properly brought within its admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1331 et seq. The Court finds that it has jurisdiction over all of the parties, and that proper venue for this suit is in this District and before this Court.

## C. LIABILITY

**1. Summary of Proceedings and Claims Asserted.**

Plaintiff commenced this suit on January 25, 2005, against Stevedore P&O Ports Texas, Inc. ("P&O") pursuant to 33 U.S.C. §905(a). After a period of discovery, and upon filing several Amended Complaints, Plaintiff ultimately dismissed P&O (being statutorily limited to a compensation remedy against that party, 33 U.S.C. §901, et seq.) and claimed against Defendants Tonghai and Cosco for negligence under 33 U.S.C. §905(b).  Defendants Tonghai and Cosco filed their Third Party Complaint against Pan Ocean Shipping Co.  Kirksey alleged that on December 14, 2004 an improperly stowed coil of steel sheet suddenly tipped over and crushed his right leg and severely injured others parts of his body. Kirksey's injuries included amputation of the right leg above the knee, "degloving" of his left, dominant hand, requiring four surgeries to address, impaling of his right upper arm and right shoulder damage, and the creation

of a permanent blood clot in his right thigh, requiring life time Coumadin (blood thinner) treatment. Defendants hotly contest liability.

**2. Evidence Reviewed and Resulting Findings.**

**a.**     Plaintiff Kirksey was born on November 20, 1967. He is a thirty-eight year old African-American male from Houston, Texas. He dropped out of high school after tenth grade and received his GED several years later. Kirksey possesses some vocational training in milling and cabinetry, but he has never worked in that trade. Kirksey has a criminal background, having been incarcerated twice in state prison for drug dealing. Over the past ten years, when he wasn't in prison, Kirksey worked on the waterfront as a longshoreman at the Port of Houston, working out of the ILA Local 24. In the several weeks prior to his December 14, 2004 injury, Kirksey joined a "core gang," meaning he worked ten hours per day virtually seven days a week. Kirksey's graduation to "core gang" status meant greater frequency of work, as it was seniority-based, and he reasonably expected his present and future earnings to grow as a result. Kirksey was earning $10.00/hour when he was injured, or about $20,800.00/year. However, his earnings in many past years have been negligible.

**b.**     On the morning of December 14, Kirksey reported to work at City Dock 26 to continue unloading heavy steel coils from the M/V TONG HAI. That vessel is owned by Tonghai and operated by Cosco, and at the time of Kirksey's injury the vessel was under charter to Pan Ocean. Pan Ocean, as shipper, had contracted with P&O Ports Texas, Inc. ("P&O") a stevedoring firm who hired laborers such as Kirksey to discharge cargo form the various holds of the vessel.      On this day, Kirksey was part of a five-man crew discharging coiled steel sheet and bundles of pipes from the vessel's No. 5 hold. There were four men, including Kirksey, in the vessel's hold, and a fifth man operated the vessel's crane, all hired longshoremen. On the

morning of December 14, 2004, an 8,000 pound steel coil fell over onto Kirksey, completely crushing his right leg from above the knee down, resulting in an above-the–knee amputation, degloving his left hand, impaling his right upper arm and severely injuring his right shoulder. The incident and injury was witnessed by Kirksey's co-workers Chris Colquitt and Gary Valley, both of whom testified at trial.

**c.**     According to deposition witness Capt. James Stemwedell, an independent marine surveyor employed by the American Bureau of Shipping, not a party to this case, who performed his on-site evaluation for P&O, the coiled steel in Hold No. 5, including the particular coil that fell on Plaintiff, was loaded in South Korea by a stevedoring firm employed by Pan Ocean.  Due to improper stowage, violent seas encountered during the vessel's passage or a combination of both, the cargo in Hold No. 5 arrived in Houston in an unreasonably dangerous condition. Specifically, in the forward part of Hold No. 5 there was a quantity of steel rails and bundles of pipes stowed in a fore and aft configuration, and in the after portion of the hold whole rolled coils of sheet steel on pallets that were stowed three tiers high from the back of the hold up to the pipes and rails.  The coils were tilted such that the edges of the coils were leaning against the sides of other coils.  The coils were not all vertical, and the pallets were turned with respect to each other, and in some cases the pallets were interlocked.    The coils should have been standing vertically, and are intended to be shipped as such.

According to Capt. Stemwedell, whose testimony the Court finds particularly credible, the coils shouldn't be touching each other, nor should they be leaning.  They are intended to be stowed vertically on the pallets, and the pallets should be oriented in roughly the same direction so that the corner of one pallet doesn't catch on another pallet as they're being lifted, and so that the pallets don't ride up on each other and break.  As noted by Capt. Stemwedell in his Report,

4

several pipes had gouged and flattened ends. This is significant because it indicates that the cargo had been struck at some point. Also, Capt. Stemwedell noted in his Report that several bundles of pipe were jammed together end to side. That's indicative of poor stowage. These items also indicated that it was going to be difficult for the stevedore to discharge those pipes. Capt. Stemwedell testified to the difficulty in discharging these coils safely because they were so closely stowed. Dunnage is wood that is placed in between cargo to separate and protect one cargo from another piece of cargo. They are "spacers." Capt. Stemwedell found that several eye-up coils were leaning against each other due to uneven dunnage, in fact "a good quantity" of them were leaning. The photographs in Capt. Stemwedell's report clearly reflect this.

Leaning of this nature – especially leaning 8,000 pound coils that longshoremen must work in and around - is not normal, and it's not proper. The Court viewed excerpts from Capt. Stemwedell's deposition, and the Court finds his testimony credible and unbiased. First, Stemwedell's observations were made prior to Kirksey's injuries and thus were not fueled by concerns of litigation. Second, Capt. Stemwedell was not retained by Plaintiff; rather, he was a surveyor retained by the Stevedore-employer offloading the Vessel. Third, Capt. Stemwedell was not paid – nor did he solicit payment - to offer his testimony in this case. Fourth, this was the first occasion Capt. Stemwedell has testified in Court – he is anything but a "hired gun."

In contrast, Defendants' paid expert – hired for the purposes of this litigation – Capt. David Scruton is an old hand at testifying in these sorts of injury cases, typically for the Defendants' interests. Capt. Scruton is an articulate, intelligent and thoroughly engaging Englishman, with excellent credentials and considerable experience. But, he did not contemporaneously view the stow before and after Kirksey's injury, and while this Court appreciates Capt. Scruton's expertise and assistance, it does not find his testimony persuasive in

this unique instance. The Court, instead, values and accepts Capt. Stemwedell's unbiased and personal knowedge and observations regarding the appalling plight Kirksey faced.

Capt. Stenwedell testified that based on his 300 times of observing the unloading of coils and surveying such cargo, he thinks there was no other way for the longshoring crew to discharge the coils on December 14, 2004.  "Once it was stowed like that, and given the limited space they had to work with, they did it as best as they could under those circumstances.  Their only real choice was to unload it or not do the job." (Capt. Stemwedell depo., 116/20 – 117/10.)  Capt. Stemwedell opined, and this Court agrees, that it is unlikely that a hook caught the coil and tipped it over because there is nothing for the hook to catch on to.  Instead, Capt. Stemwedell opined and this Court agrees, due to the improper stowage such as is seen in Stemwedel's photos attached to his Report (P.'s Ex. 29), even the slightest vessel movement or crane movement can cause a coil to move.  The Court finds that vessel owner Tonghai failed to exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore [would] be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety."  In fact, upon confronting this stow, the longshoremen, including Kirksey, were left with an impermissible "choice:" unload an unreasonably dangerous stow or walk off the job.  Kirksey "chose" to work, and he was severely injured as a result.

**d.**     The longshoremen and their supervisors at P&O were <u>never</u> told by the vessel crew or Pan Ocean representatives that the TONG HAI had encountered Beaufort Scale Force 9 winds during the vessel's passage.  (See P's Ex. 30 (deck logs for Nov. 2 and 3, 2004); P's Ex. 19 (Chief Officer's Note of Protest documenting "very heavy weather" and "fearing loss and/or damage"); P's Ex. 14, p. 2 (O'Keefe Outturn Survey commissioned by Pan Ocean documenting

6

Chief Officer's reporting "winds to a maximum of Beaufort scale force 10 were encountered for a couple of days"); Gonzalez depo., 133/5 – 135/5; Stemwedell depo., 44/5 – 48/14; Tr. 44/20 – 45/4 (Colquitt.)  The vessel's crew considered the weather severe enough to damage, and certainly dislocate, the cargo; yet, despite being asked specifically whether the vessel had encountered such weather and had filed such a protest, the crew did not share this vital information with the longshoremen.  This omission proved nearly fatal to Kirksey.

**e.**     Defendants' opening statements promised evidence proving that the coil was tipped over by the lifting of the vessel crane's hook.  It was never presented.  Specifically, Defendants claimed that the longshore crew's "bandcutters" were being lifted out of Hold No. 5 immediately before the coil fell, and they blamed the longshore crane operator for negligently contacting the coil with the ascending hook, thereby causing the coil to tip over onto Kirksey.  This alleged version of the incident, however, is effectively refuted by the credible trial testimony of the two live eyewitnesses, Gary Colquitt and Gary Valley.

Colquitt, a fellow longshoreman working for ILA Local 24, was standing next to Kirksey when Plaintiff's leg was crushed.  Colquitt testified how the longshoremen were attaching slings to each coil – two men were standing on the coils several feet above the vessel hold's floor, and two men were on the floor itself threading the slings up through the eye of the coils.  On the occasion in question, Colquitt and Kirksey were working from the floor of Hold No. 5, and Valley and Longshoreman Michael Gibson were standing on top of the second tier of stacked coils.  The coils were four feet tall each, so Valley's and Gibson's feet were eight feet above Colquitt's and Kirskey's feet.

Valley testified that Gibson hooked the bandcutters to the crane hook, and Valley observed the crane hook ascend with the bandcutters attached.  After the hook began ascending,

7

without ever making contact with the coil, Valley testified "we could feel a motion" and then he observed the coil moving toward Kirksey. Valley shouted "Get out of the way," but it was too late for Kirksey to avoid being hit by the coil. The Court finds, based on the live eyewitness testimony of Colquitt and Valley, it would be physically impossible for the hook to make contact with the coil that tipped over onto Kirksey. The likely cause of the coil's movement, the Court finds, was proven through Colquitt's observation at trial that when "the crane go up [sic] and come back down, the ship would move." Given the already precarious stow, in which the coils were dangerously leaning, the sensation of movement felt by Valley and the fact that the vessel would move when the crane was operated, the Court finds that the vibrations caused by operation of the vessel's crane jarred the already poorly-stowed coil loose, causing it to tip over onto Kirksey. This dangerous condition of the stow is further proven by Valley's testimony that when he cut the bands off the leaning coils, the coils would move.

The Defendants' alleged version of events, in which they seek to implicate the longshore crew's crane operator, simply did not occur. The Court's finding is amply supported by the contemporaneous, eye witness-based testimony of Plaintiff's non-retained expert and P&O's surveyor Capt. James Stemwedell, whom, again, the Court finds persuasive and credible. The Court finds that the testimony elicited from Defendants' expert witness, Capt. David Scruton - who the Court notes did not personally view the stow and therefore has no contemporaneous personal knowledge of the conditions - is not credible because it is based on evidence that was shown to be completely false at trial. Specifically, the Court finds that this false testimony - the deposition testimony of Michael Gibson – in which Gibson claims he saw the hook contact the coil - is incredible. First, Gibson's claim that the crane made contact with the coil was directly and unequivocally refuted by both of the live trial eye witness. It was also refuted by the crane

8

operator who, at his deposition, testified emphatically that the hooks were lowered to a height well above the workers' heads, rather than below their heads where the crane could have possibly contacted the coil. Further, Gibson's testimony – that the bandcutters were never found, and that he found them many hours later, well after Kirksey had been evacuated by life flight – was not corroborated. Colquitt, Valley, Kirksey and Pruitt all testified consistently to the following sequence of events: the bandcutters were requested, they were promptly attached to the crane and they were lifted from the hold immediately.

Additionally, Gibson's version elicited at his deposition, in which he claimed that the crane operator prematurely lifted a partially slung coil, was directly refuted by Valley at trial. Specifically, Valley testified, and the Court believes, that Valley unhooked his coil, leaving nothing attached to the hook, Valley witnessed <u>Gibson</u> attach the bandcutters to the hook, Valley watched the bandcutters ascend, Valley then felt the coil he was standing on move and Valley then observed the adjoining coil lean and tip over onto Kirksey. Thus, the Court finds that the dangerous condition of the stow – the leaning coils, the inadequate dunnage, the lack of uniformity in the stow - was the overwhelming proximate cause of Kirksey's injuries. The Court finds that Kirksey's acts or omissions contributed ten percent (10%), to causing his injury. Accordingly, the Court assigns 45% fault to vessel owner/operator Tong hai and Cosco and 45% fault to charterer Pan Ocean.

### D. EVIDENCE ON MEDICAL CAUSATION, CURE AND FUTURE MEDICAL

**1.**     Kirksey's physical injuries were horrific. Kirksey was unable to escape the path of the 8,000 pound coil, the coil struck his right shoulder, pushing him into a wall of pipe. He fell in a sitting position and the coil landed on his right leg, completely crushing it from above his knee down. As the coil fell on him, Kirksey reflexively swatted at it, "degloving" his left hand.

"Degloved" means when the skin has been disrupted and then peeled away from the lower levels that support the skin. His right upper arm was impaled by a pipe, and he hurt his right shoulder. Colquitt testified that Kirksey was "screaming for his life." Gonzalez testified at his deposition that when he arrived on the scene of the accident Kirksey was repeatedly saying "My God" – he was in fear for his life, and he was crying and trembling and scared. There was copious blood. Kirskey was evacuated by helicopter to Memorial Hermann Hospital where he immediately underwent a "Guillotine right leg, above-the-knee amputation" and a "washout and debridement" of his right shoulder. He endured revisions of both surgeries two days later on December 16, 2004.

In the ensuing months, he underwent four more surgeries to repair his left hand, including a surgery to harvest bone to assist in repairing the ulna forearm bone in which the surgeons inserted long plates & screws, and to harvest bone to grow three left finger bone segments, using stainless steel pins to cause those to heal. Kirksey required other surgeries to deal with an infection at the site of the bone harvest, removal of pins and repair of tendons to restore the function of thumb opposition. Kirksey also began treating and undergoing extensive therapy at TIRR in Houston, an internationally renowned traumatic rehabilitation facility, under Dr. William H. Donovan's care. He was prescribed a prothesis and a wheelchair, which he uses interchangeably.

Kirksey experiences and continues to take medication to control "phantom pain." Kirksey testified he can "feel [his foot] itching, but it's not there." Dr. Donovan explained Kirksey's phantom pain as a neuropathic pain originating from the nerves, not originating from muscle or bone. This pain is perceived as a painful sensation in the part of his body that is now missing – his lower right leg, and it is felt in the remaining body part as well. It manifests as a

burning or stinging when skin is lightly touched; it is aggravated by weather, and when emptying the bowel or bladder, and an infection elsewhere in the body can aggravate this neuropathic – or "phantom" – pain.

2.      The Court finds that Plaintiff's uncontroverted, reasonable and necessary medical expenses in the past total $249,444.17.  This sum was stipulated by the Parties.

3.      Dr. Donovan presented, and the Court accepts, a credible and reasonable life care plan for Kirksey.  Dr. Donovan testified that Kirksey, an African American male, 38 years of age at trial,  is likely to live another 37.4 years.  The anticipated cost of this life care plan over his remaining lifespan is based upon Dr. Donovan's following uncontroverted testimony: Kirksey requires physician visits, every 6 months, $250/yr.; revision of amputated limb $22,430 (one time cost); therapy evaluations & interventions, yearly, four sessions $707/yr.; medications $3,277/yr.; prosthesis fees $8,292-$14,767/yr.; the range depends upon the components and the frequency with which he will need to change the prosthesis - every 3-5 years. The Court finds that the annual cost range of $8,292-$14,767/yr. reflects the range of how often the prosthesis will need to be changed out. The Court, therefore, will assume the mid-point annually, or $11,529.50.  Wheelchair-cushion and maintenance will cost $1,161 per year; supplies including shower bench, beside commode, crutches, etc., $929/yr.; Dr. Donovan approves an allowance in the life care plan for home maintenance such as lawn care and housekeeping services, $4,720 per year; but the Court finds $2,000 per year more reasonable; architectural renovations for handicap accessibility - one time cost of $34,000.  Excluding the two one-time cost components (the stump revision and the architectural renovations for handicap accessibility), the annual cost of these recurring components of the life care plan total $19,853.50/year. Multiplying that annual sum by 37.4 totals $742,520.90 (not reduced to present value).  The two one-time charge

components of the life-care plan (the stump revision at $22,430 and the architectural renovations for handicap accessibility at $34,000) total $56,430.  As a result of the complete crush injury to his lower right leg, Kirksey also developed a potentially life-threatening condition known as deep vein thrombosis, essentially a blood clot in his leg, for which he has been prescribed blood thinners and associated testing for life.  The reasonable future cost of this necessary Coumadin treatment and related testing is $3,100.00/year. That annual sum, multiplied by 37.4 years, totals $115,940.00 in future additional medical costs (not reduced to present value).  Accordingly, the Court finds the annual charges of the life care plan ($742,520.90), the two one-time charge components of the plan ($56,430) and the Coumadin treatment over the course of Kirksey's life ($115,940.00) total reasonable and necessary future medical charges of $914,890.90 (not reduced to present value).

**4.**     Dr. Donovan testified Kirksey's restrictions are:  no standing or walking for more than 10 minutes continuously; he must be sitting 75 % of the workday; no lifting or carrying more than 20 lbs.; no climbing more than two flights of stairs per shift; no left hand fine motor activities more than 15 minutes continuously, total maximum of 4 hours per shift; no squatting, no kneeling or climbing ladders. Defendants' vocational rehabilitation expert, William Quintarilla, confirmed Plaintiff is limited to a "basic" sedentary job.  The Court finds that Kirksey will be able to do sedentary functions only.  The Court also finds that while Kirksey had previously expressed his desire to pursue work as a barber; and for that reason he had a Functional Capacity Evaluation ("FCE"); in reasonable medical probability he cannot function as a barber according to the FCE's conclusions (can't stand for more than 10 minutes; no left hand function for more than 15 minutes at a time; four hours total/shift); and these will be lifetime restrictions. That is, Kirksey will be restricted to sedentary work for life.  Kirksey has suffered a loss of left hand

(dominant) grip strength; he can exert 90 lbs, which is below the norm of 120 lbs; non dominant grip is 80 lbs, which is below the norm of 113 lbs.

5.      In addition to the horror and shock of his life-altering experience on December 14, 2004, the Court finds that Plaintiff has undergone at least six surgical procedures, including the amputation above the knee of his right leg, extensive and intensive physical therapy and analgesic care, and a substantial medication regimen, including Coumadin which he will have to take for the remainder of his life to avoid pulmonary emboli. He has willingly undergone functional capacity evaluation to return to work, but his physical limitations will not allow him to work as a barber. The Court finds that Plaintiff is significantly disabled, that his injuries and disability will last his lifetime, and that he has experienced substantial subjective losses, including loss of physical abilities, loss of the enjoyment of life, pain and suffering and mental anguish in the past and in the future, as well as significant and permanent disfigurement. The Court finds that all of these losses, both subjective and objective, are the direct and proximate result of the negligence of both Defendants, as well as himself, based upon the above liability apportionment. The Court finds that a fair and reasonable amount for Plaintiff's past subjective losses is $400,000.00, and that the value of his future reasonably probable subjective losses, to occur over his remaining lifetime, equal an additional $350,000.00.

### E. ECONOMIC DAMAGES

**1.** The Court recognized Dr. Kenneth G. McCoin, Plaintiff's economist, as an expert in evaluation of economic loss pursuant to Rule 702. The Court finds, based upon the report of Dr. McCoin, using the standards of *Culver II* and its progeny, and based on the evidence before the Court, that Plaintiff has sustained past and future economic losses, inclusive of lost wages and

fringe benefits.  But, the Court also recognized Defendants' economist, Dr. James Yeager, and finds them both credible.

**2.** According to Dr. McCoin, whose report was accepted in lieu of testimony, Plaintiff has a work life expectancy of 23.5 years.  Defendants' economist, Dr. Yeager, calculated Plaintiff's work life expectancy at 23 years.  Based on Kirksey's "core-gang" level of earnings, Dr. Yeager found past wage loss (December 14, 2004 to July 13, 2006) of $40,000.00.  Plaintiff was not a high wager earner historically, however, so based on Dr. McCoin's assumption that Kirksey would earn only $6.00/hour (after some retraining) starting January 1, 2007, Dr. Yeager agreed that future wage loss would only be up to $200,000.00.  Dr. Yeager agreed that, for calculating Kirksey's past and future economic loss, $240,000.00 is a "real good number" – in fact, referring to the $240,000.00 calculation done in open Court, he testified he would "stand by that report."  The Court agrees.  The Court finds that Plaintiff has sustained past economic losses, from date of injury through date of this Judgment, equaling $40,000.00.  The Court finds that Plaintiff has sustained future economic losses, from the date of this Judgment to the end of Plaintiff's expected work life, of $200,000.00, which the Court discounts to present net cash value of $160,000.00, for a total, past and future, of $200,000.00.

### F. PREJUDGMENT INTEREST

**1.** Under maritime law, the awarding of pre-judgment interest on past damages is the rule rather than the exception, and, in practice, well-nigh automatic. *Reeled Tubing, Inc. v. M/V CHAD G,* 794 F.2d 1026, 1028 (5th Cir.1986). A trial court only has the discretion to deny pre-judgment interest where peculiar circumstances would make such an award inequitable. *See id.* In this Circuit, pre-judgment interest is usually awarded to the date of loss to ensure that the injured

Plaintiff is compensated for the use of funds to which the Plaintiff was entitled, but which the Defendant had use of prior to Judgment. *See Reeled Tubing, Inc.,* 794 F.2d at 1028.

**2.** The Court also has broad discretion in setting the rate of prejudgment interest. *See id.* at 1029. In setting the rate of pre-judgment interest as to past damages, the Court appropriately may look to reasonable guideposts, including the interest rates set forth in 28 U.S.C. § 1961 for judgments. *See id.* The Court finds the most equitable rate of pre-judgment interest would be 6.0%. Accordingly, the Court finds and awards on all damages accrued through the entry of Judgment pre-judgment interest at that rate.

## II. CONCLUSIONS OF LAW

**1.** The Court has jurisdiction over the subject matter of this dispute and over the parties. All parties and claims are properly before the Court. Venue is uncontested.

**2.** To recover under the Longshore and Harbor Workers Compensation Act ("LHWCA"), a worker must be engaged in maritime employment and must be injured on a maritime situs. 33 U.S.C. § 904; *Northeast Marine Terminal v. Caputo*, 432 U.S. 249, 255 (1977).

**3.** The Court finds that the M/V TONG HAI, docked at City Dock 26 at the Port of Houston, the situs upon which Plaintiff was working at the time of his accident, is a maritime situs.

**4.** Under the Longshore and Harbor Workers Compensation Act the term "employee means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker….[.]"  33 U.S.C § 902 (3).

**5.** The Court concludes that Patrick Kirksey is a covered employee under the LHWCA.

**6.** A longshoreman may pursue a tort action against the owner of a vessel, such as the M/V TONG HAI, and against the charterer, such as Pan Ocean Shipping Co., Ltd., for acts of vessel negligence. 33 U.S.C § 905(b).

**7.** Before operations begin, the vessel owner must exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety." *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 98-99 (1994); *Scindia Steam Navigation Co., v. De Los Santos*, 451 U.S. 146, 167 (1981); *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 416-17 (1969).

**8.** Before operations begin, the owner must also warn the stevedore of hidden dangers that could not be discovered by the exercise of ordinary care. *Scindia Steam Navigation Co., v. De Los Santos*, 451 U.S. 146, 167 (1981); *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 535 (5th Cir, 1986).

**9.** A shipowner has a duty to warn a stevedore of severe weather in transit that caused the ship's cargo to shift. *The Etna*, 43 F.Supp. 303, 305 (E.D. Pa. 1942); see also *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 99, 114 S.Ct. 2057, 2064, 129 L.Ed.2d 78 (1994) and *Curtis v. A. Garcia v Cia., Ltda.*, 241 F.2d 30 (3rd Cir. 1957).

**10.** Under *Scindia*'s turnover duty, a Shipowner and a Charterer each has a duty to warn the stevedore when it knows, or should have known, that the vessel's cargo is improperly stowed. *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 99, 114 S.Ct. 2057, 2064, 129 L.Ed.2d 78 (1994). That the condition is "open and obvious" is not a complete defense to the longshoreman's suit. *Harris v. Flota Mercante Grancolombiana*, 730 F.2d 296, 299 (5th Cir. 1984). "A longshoreman's own knowledge of shipboard hazard will not negate a shipowner's duty of care which would otherwise exist." *Stass v. American Commerical Lines, Inc.*, 720 F.2d 879, 882 (5th Cir, 1983), quoting Comment, 56 Tul. L.Rev. 1421, 1432 (1982). See also *Morris v. Compagnie Maritime des Chargeurs Reunis, S.A.*, 832 F.2d 67, 70 (5th Cir. 1987) (accord).

**11.** The injuries sustained by Plaintiff Patrick Kirksey, as described in the Court's Findings of Fact, were proximately caused by the negligence of Defendants Tonghai Maritime and Pan Ocean Shipping Co., Ltd. (45% each) and such negligence was a legal and factual cause of Plaintiff's injuries. *Kanischer v. Irwin Operation Co.,* 215 F.2d 300, 303 (5th Cir.1954), *Cert. Den.* 348 U.S. 942, 75 S.Ct. 363, 99 L.Ed. 737 (1955). Contributory negligence on the part of Plaintiff has been established, at 10% of total fault. Consequently, Defendants are 90% liable,

jointly and severally, to Plaintiff for his damages sustained as a result of the subject incident, including loss of wages and benefits in the past and loss of net future earning capacity, reasonable costs of necessary medical and hospital care in the past and future, physical pain and suffering including physical disability, impairment, inconvenience, the effects of Plaintiffs' injuries upon the normal pursuits and pleasures of life, and mental anguish, both past and future, and past and future loss of household services, as calculated in the Court's Findings of Fact. *See Williams v. Chevron,* 875 F.2d 501, 506 (5th Cir.1989). The future losses must be discounted. *Culver v. Slater Boat Co.,* 722 F.2d 114, 117 (5th Cir.1983). Future lost income must also reflect adjustment to net, after-tax value. *Norfolk and W. Ry. v. Liepelt,* 444 U.S. 490, 493-94, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980).

**12.** Even if Tonghai was negligent partly as a vessel owner and Plaintiff's employer was partly negligent as well, Tonghai's negligence as vessel owner – even if 1% - supports a judgment against it for all of Patrick Kirksey's damages, (not attributed to him). *Edmonds v. Compagnie Generale Transatlantic*, 443 U.S 256, 264 (1979); *Smith V. Eastern Seaboard Pile Driving, Inc.*, 604 F.2d 789, 796-97 (2nd Cir. 1979). Likewise, even if Pan Ocean was negligent partly as a charterer and Plaintiff's employer was partly negligent as well, Pan Ocean's negligence as charterer – even if 1% - supports a judgment against it for all of Patrick Kirksey's damages (not contributed to him).

**13.** The award of for physical pain and suffering including physical disability, impairment, inconvenience, the effects of Plaintiffs' injuries upon the normal pursuits and pleasures of life, and mental anguish, past and future, is reasonable under the circumstances. *See Couch v. Cro-Marine Transp. Inc.*, 44 F.3d 319, 327 (5th Cir. 1995)

**14.** Pre judgment interest is available for past damages in Admiralty.

**15.** The Court concludes as a matter of law that plaintiff has sustained his burden of proof by a preponderance of the evidence showing that defendants herein breached their duty of reasonable care in their capacity as vessel owner and vessel charterer, respectively; therefore, the Court finds that Plaintiff may have recovery herein and the Court will enter judgment in Plaintiff's favor.

**16.** To the extent any Finding of Fact constitutes a Conclusion of Law, the Court hereby adopts it as such. To the extent any Conclusion of Law constitutes a Finding of Fact, the Court hereby adopts it as such.

**17.** For reasons set out in the Court's Findings of Fact and Conclusions of Law, and pursuant to Rule 58 of the Federal Rules of Civil Procedure, Judgment is hereby rendered in favor of Plaintiff on his stated claims against Defendant. Therefore, Plaintiff PATRICK KIRKSEY shall have and recover from Defendants TONGHAI MARTIME, COSCO BULK CARRIERS CO., LTD. AND PAN OCEAN SHIPPING CO., LTD., 90% of his losses and damages, or the total amount of $1,902,901.56, plus taxable costs of court and pre-judgment interest as set forth herein, and post-judgment interest at the rate of 6.0% per annum, for which execution shall issue if not timely paid.  Out of such total damages, Plaintiff is obligated to reimburse any lien for compensation and/or medical benefits, if any, received to date.

**IT IS SO ORDERED.**

**DONE** this the 22nd day of May, 2007, at Galveston, Texas.

---

Samuel B. Kent
United States District Judge